GEORGE M. GILL, TRUSTEE, &c., OF LYDE GOODWIN, *v.* ROBERT OLIVER'S EXECUTORS, AND GLENN AND PERRINE, TRUSTEES.

In 1839 a treaty was made between the United States and Mexico, providing for the "adjustment of claims of citizens of the United States on the Mexican republic."

Under this treaty a sum of money was awarded to be paid to the members of the Baltimore Mexican Company, who had subscribed money to fit out an expedition against Mexico under General Mina, in 1816.

The proceeds of one of the shares of this company were claimed by two parties, one as being the permanent trustee of the insolvent owner of the share, and the other as being the assignee of the provisional trustee and afterwards the assignee of the insolvent himself.

The judgment of the Court of Appeals of Maryland, that the latter claimant is entitled to the money, is not reviewable by this court under the twenty-fifth section of the Judiciary Act.

THIS case came up by writ of error to the Court of Appeals for the Western Shore of Maryland, being the highest court of law and equity in that State; which writ was issued under the twenty-fifth section of the Judiciary Act.

It was argued at last term, on a motion to dismiss for want of jurisdiction. But the court reserved the point till final hearing. On the hearing at this term, the question of jurisdiction continued to be the most important question in the case, — and that on which it was decided by the court.

A brief history of the facts connected with the case, and of the pleadings, will be sufficient to exhibit the questions involved.

In the year 1816, General Xavier Mina, who was at that time connected with the revolutionary party in Mexico in opposition to the authority of Spain, came to the city of Balti-

more, and there entered into a contract with certain gentlemen of that place, who associated themselves under the name of the "Baltimore Mexican Company," for the purchase of a quantity of arms, ammunition, &c., to fit out an expedition against the *then* government of Mexico. On account of the risk attending their delivery and the uncertainty of the payment, it was agreed that Mina should pay one hundred per cent. on the cost of the articles, and interest. The goods were shipped for Mexico, and delivered according to contract, but were not paid for by General Mina, as he was soon after taken prisoner and shot.

From this time till 1825, the recovery of the claim was considered hopeless.

In 1825, Mexico had achieved her independence, and after much solicitation the government was persuaded to acknowledge the justice of this claim, and assume the payment of it by an act of Congress passed to pay the debts of Mina. But notwithstanding the recognition of this claim as a debt, its payment was delayed for many years, and seemed almost hopeless.

Many and larger claims were held by citizens of the United States against Mexico, of which the government had been urging the payment, and finally, on the 11th of April, 1839, a convention was concluded between the Secretary of State of the United States and the Mexican Minister, " for the adjustment of claims of citizens of the United States of America, upon the government of the Mexican republic." By this treaty *all claims* by citizens of the United States upon the Mexican government, &c., were referred to four commissioners, " who were authorized to decide upon the justice of said claims, and the amount of compensation due from the Mexican government in each case."

As the claim of the " Baltimore Mexican Company " had been recognized as a debt of the Mexican government by a solemn act of their Congress, its justice could not well be denied. It was accordingly allowed by the commissioners, on proof of its correctness and exhibition of the original contract with Mina.

David M. Perrine and John Glenn, who claimed to be assignees in trust of eight of the nine shares into which the stock of the company had been divided, received the amount of the award, and according to agreement with their *cestui que trusts,* deposited the money in the Mechanics' Bank of Baltimore, to be distributed according to the respective rights of the parties claiming it.

Soon after this was done, Philip E. Thomas and John

White filed their bill in chancery against said Perrine and Glenn, claiming the share of —— Smith, and praying the intervention and assistance of a court of equity, in order to the just distribution of the proceeds of the award in the hands of the trustees.

The defendants, Perrine and Glenn, came into court, and submitted " that they are willing and desirous that the proceeds of the award may be distributed among the parties under the direction of the court, &c., and join in praying an early reference to an auditor for that purpose."

The money being thus in court for distribution, all persons who laid any claim to it intervened by bill or petition against the trustees and opposing claimants. Among others, the plaintiff in error, George M. Gill, filed his bill, claiming the share and interest of Lyde Goodwin, who was one of the original nine or ten persons who were partners or members of the " Baltimore Mexican Company."

The bill alleges, that this company was formed in 1816 ; that Lyde Goodwin owned one ninth part of the property ; that in February, 1817, Lyde Goodwin applied to the court for the benefit of the insolvent laws of Maryland, which he duly received ; that the complainant was appointed permanent trustee, and gave the proper bond for faithful performance of the trust. The bill goes on to state the convention with Mexico in 1839, the award of the commissioners, the receipt of the share of Lyde Goodwin by Glenn and Perrine, under a power of attorney from Oliver's executors, who claimed title to the same under a pretended assignment from George J. Brown, the provisional trustee of said Goodwin, and finally prays that the executors of Oliver, the claimant of the share, and said trustees, may answer, account, and bring the certificates (in which payment was made) into court, that they may be delivered over to complainant.

The complainant filed also another bill against the trustees and all other claimants, for the sum of five per cent. on the whole amount, as due to Lyde Goodwin for services rendered to the company, by contract with them.

The complainant founded his claim to the money in both cases on the allegation " that all Lyde Goodwin's interest in said property and claims had become vested in the petitioner by virtue of his application and the laws of the State."

The answers of the defendants admit the application of Lyde Goodwin for the benefit of the insolvent laws and his discharge ; but state that the complainant, Gill, was not appointed permanent trustee till March, 1837 ; that on the 26th of February, 1817, George J. Brown was duly appointed by the court provisional trustee, and gave bond and security, and

that the debtor, Lyde Goodwin, on the same day executed to said trustee a deed of assignment of all his property. That in 1825 said Brown conveyed to Robert Oliver, and afterwards, on the 30th of May, 1829, Lyde Goodwin assigned and conveyed to said Oliver all his title and interest in the claim of the company on Mexico. The defendants allege and plead, that by these assignments the title to the share of Lyde Goodwin vested in Robert Oliver in his lifetime, who is now represented by his executors.

There was no dispute on the facts of this case, and the only questions of law involved in it are, whether, by the insolvent laws of Maryland, the title of Gill, as permanent trustee, to the money in court, was better than the previous assignment by the provisional trustee and Lyde Goodwin himself. On the one side it was contended that, by the insolvent act of Maryland passed in 1805, all the property and estate of the insolvent which he held at the time of his discharge vested in his permanent trustee whensoever he should thereafter be appointed, and that the deed from the provisional trustee, George J. Brown, conveyed no title to Oliver, under the insolvent laws. Nor did the deed of Goodwin himself convey any title, because by his insolvent proceedings all his right, title, and interest in this claim became divested.

On the contrary, the executors of Oliver contended that, until the recognition of this claim by Mexico, in 1825, it did not constitute such property as would pass by the insolvent assignment. That after, by the labors of Goodwin and other agents of the company, this claim was assumed by Mexico, and acknowledged as a debt, it vested in Goodwin as a new acquisition, which he might convey. And of this opinion was the Court of Appeals of Maryland.

The judgment of the Court of Appeals of Maryland was as follows : —

" The appeal in this case coming on for hearing, and having been fully argued by the solicitors of the respective parties, has been since fully considered by the court ; and it appearing to the court that that part of the decree appealed from of the court below, which directed any portion of the fund in controversy to be transferred or paid to the appellee, George M. Gill, as permanent trustee of Lyde Goodwin, was erroneous, and should be reversed ; and it also appearing to the court that said portion of said fund should be paid over and transferred to the appellants, Charles Oliver, Robert M. Gibbs, and Thomas Oliver, as executors of Robert Oliver, in the proceedings mentioned, together with all accumulations of interest or dividends since accruing upon the same :

" It is thereupon, by this court, and the authority thereof, on this 23d day of June, in the year 1849, adjudged, ordered, and decreed, that the said decree of the court below, so far as the same adjudged and decreed any portion of the fund in controversy to be transferred or paid to the said George M. Gill, as permanent trustee of Lyde Goodwin, be, and the same is, reversed and annulled ; and this court, proceeding to pass such decree in the premises as they are of opinion should have been passed by the court below, do further adjudge and decree, that all and every part of such portion of said fund, so by the court below decreed to be transferred or paid to said George M. Gill, as trustee aforesaid, be, by the trustees in the proceedings mentioned, David M. Perrine and John Glenn, transferred or paid over to the appellants, Charles Oliver, Robert M. Gibbs, and Thomas Oliver, as executors of Robert Oliver ; together with all and every accumulation of interest or dividends, or investments of the same, made or accruing in and upon such part or portion of said fund ; and it is further, by this court, and its authority, adjudged and decreed, that all other portions of the decree of the court below, except such as is hereby reversed, be, and the same is hereby, affirmed ; it is further adjudged and decreed, that the reversal of the decree of the court below be without costs."

The opinion of the said Court of Appeals was as follows : —

" The majority of this court, who sat in the trial of this cause, (and by which was decreed the reversal of the decree of the County Court,) at the instance of the solicitors of the appellees, briefly state the following as their reasons for such reversal. They are of opinion that the entire contract, upon which the claim of the appellees is founded, is so fraught with illegality and turpitude, as to be utterly null and void, and conferring no rights or obligations upon any of the contracting parties which can be sustained or countenanced by any court of law or equity in this State, or of the United States; that it has no legal or moral obligation to support it, and that therefore, under the insolvent laws of Maryland, such a claim does not pass to or vest in the trustee of an insolvent petitioner. It forms no part of his property or estate, within the meaning of the legislative enactments constituting our insolvent system. It bears no analogy to the cases, decided in Maryland and elsewhere, of claims not recoverable in a court of justice, which nevertheless have been held to vest in the trustees of an insolvent or the assignees of a bankrupt. In the case referred to, the claims, as concerned those asserting them, were, on their part, tainted by no principle of illegality or immorality ; on the

45*

contrary, were sustained by every principle of national law and natural justice, and nothing was wanting to render them recuperable, but a judicial tribunal competent to take cognizance thereof. Wholly dissimilar is the claim before us. Such is' ts character, that it cannot be presented to a court of justice but by a disclosure of its impurities; and if any thing is conclusively settled, or ought to be so regarded, it is that a claim, thus imbued with illegality and corruption, will never be sanctioned or enforced by a court either of law or equity.

Entertaining this view of the case, it is unnecessary to examine the various minor points which were raised in the argument before us."

To review the judgment of the Court of Appeals, Gill sued out a writ of error, and brought the case up to this court.

It was argued by *Mr. Nelson* and *Mr. Dulany*, for the plaintiff in error, and *Mr. Johnson* and *Mr. Campbell*, for the defendants in error.

The point of jurisdiction was thus stated in the brief of the counsel for the plaintiff in error.

5th. That the decision of the commissioners, and their award, conclusively established the amount and validity of the claim of the Mexican Company, which under the act of Congress it was their duty to decide " according to the provisions of said convention, and the principles of justice, equity, and the law of nations." That the Court of Appeals, in deciding that the contract upon which the claim of said company was founded was so fraught with turpitude and illegality as to be utterly null and void, comes in direct conflict with the decision and award of the commissioners. Comegys *v.* Vasse, 1 Peters, 212; Frevall *v.* Bache, 14 Peters, 95; Sheppard *v.* Taylor, 5 Peters, 710.

6th. Wherefore the plaintiff in error will further contend, that by the decision against his claim, set up in the pleadings on the record in this case, under the said treaty, act of Congress, and award in pursuance thereof, by the Court of Appeals, the construction, operation, and effect of the said treaty, act of Congress, and the award in pursuance thereof, were' necessarily drawn in question and directly decided. And therefore this court has jurisdiction to entertain the present appeal. 5 Cranch, 344; 6 Cranch, 281; 1 Wheat. 305, 315, 335; 2 Peters, 245, 250, 380, 410; 3 Peters, 290, 352; 4 Peters, 410; 6 Peters, 41, 48; 10 Peters, 363, 398; 16 Peters, 281; Judiciary Act of 1789, § 25; Osborn *v.* Bank of U. States, 9 Wheat. 748.

The following notes of the argument of *Mr. Dulany* show

the reasons why he maintained this point. After giving a narrative of the case he proceeded as follows.

From the foregoing extracts I think it clearly appears, that it was the design of the treaty to give compensation to claims which antecedently had been preferred against the Mexican government, if upon examination they should turn out to be just.

That upon the determination of such claims, and an award given for the amount, the claims themselves became extinguished and merged in the awards, which follows not more from the operation of general principles of law, than the express provisions of the treaty, which in its twelfth article declares that the United States agree for ever to exonerate the Mexican government from any further accountability for claims which should either be rejected by the board, &c., or which, being allowed, &c., should be provided for by the government in the manner before mentioned.

Whoever, then, claims a right to the certificates issued on the award in favor of the Mexican Company must claim it under the treaty by which, and the act of Congress to carry it into effect, they were created. It is to the treaty they owe their existence, their obligation, and their value.

The right and title which the plaintiff in error claims in his petition under the treaty to the certificates in question have never been perfected in him by a delivery of the certificates themselves; nor indeed in any other person. For although they came to the possession of Glenn and Perrine from the Secretary of the Treasury, yet the delivery to them was not as owners, but it was qualified by the terms of the award under which they were issued. The award assigned to "Glenn and Perrine" eight shares of the Mexican Company, including that of Lyde Goodwin, "as trustees for Robert Oliver's legal representatives, and whomsoever else it might concern, in the ratio of their respective interests." Thus the certificates were delivered to Glenn and Perrine as trustees and depositaries for the true owners, whomsoever they might be; and Glenn and Perrine in point of fact, when the plaintiff in error filed his petition, had delivered them to no one, but, on the contrary, had submitted the question of their distribution to the jurisdiction of Baltimore County Court sitting in equity.

Hence it follows, that a perfected title to the certificates in controversy in this case has as yet never vested in either party thereto, but that the right and title demanded on the one side and the other, growing, as the plaintiff in error claims, immediately out of the treaty, remain to be ultimately determined by the true construction thereof by this court, the Court of

Appeals in Maryland having decided against the right thus claimed.

Now, if nothing more appeared in the record than the right claimed by the plaintiff in error in his pleadings, by and under the treaty, and the decision of the court below against the right thus claimed, that brings this cause within the appellate jurisdiction of the Supreme Court, under the twenty-fifth article of the Judiciary Act. 7 Howard, 743 – 772.

But it is said that, because the plaintiff in error has set forth the title which he derived under the insolvent laws of Maryland to Goodwin's share in the Mexican Company, no such right, title, or privilege, under the convention with Mexico, is set up by the plaintiff in error in his petition, and no decision against any such right, title, &c. made by the court below as would give jurisdiction to review it to this court, under the twenty-fifth section of the Judiciary Act, but that the whole case turns upon the construction of the laws of Maryland.

In this position I apprehend there is great error, and ample authority in the former decisions of this court for its condemnation.

It is perfectly true that the plaintiff in error has alleged that, by the laws of Maryland, the share which was of Goodwin in the Mexican Company, on the 25th of February, 1817, became vested in him, being the permanent trustee of Goodwin, as of that day. And I insist that it is in reference to this very title, thus acquired, under the laws of the State, that the treaty is to be interpreted, in order that the rights and benefits which it designed to bestow should be awarded to the proper person. In this view of the case, the State laws, or general principles of law, are to be construed and interpreted as incidental to, and absolutely essential in, the mere exercise of the power and duty of construing the treaty itself. In determining whether the plaintiff is entitled to the certificates which he claims under the treaty, it is necessary to inquire into the validity of the title under which he claims; and how can this be accomplished without the consideration of all legal questions which might affect that validity, and so influence the decision upon the rights claimed under the treaty? If the plaintiff in error is entitled, by the law of Maryland, to the share in the Mexican Company which was of Lyde Goodwin, in order to receive the benefits and protection of the convention with Mexico, then it becomes necessary in dispensing those benefits, and applying to his case the protection of the treaty, to determine his title upon that law. This has heretofore been the well-established practice of this court.

In Owings *v.* Norwood, 5 Cranch, 344, C. J. Marshall said:

" Each treaty stipulates something respecting the citizens of the two nations, and gives them rights. Whenever a right grows out of, or is protected by a treaty, it is sanctioned against all the laws and judicial decisions of the States; and whoever may have this right, it is to be protected."

In Smith v. The State of Maryland, use of Carroll et al. (6 Cranch, 286 ; 2 Cond. R. 377), the principle here contended for is fully asserted, and clearly explained and applied. The whole dispute there turned upon the construction of a State statute; and the benefit and protection claimed by the plaintiff in error as arising out of the treaty, it was admitted on both sides, depended upon the interpretation of the Maryland law.

In the opinion of the court they say : " It is contended by the defendants in error, that the question involved in the cause turns exclusively upon the construction of the confiscation laws of the State of Maryland, passed prior to the treaty of peace, and that no question relative to the construction of that treaty did or could occur. That the only point in dispute was, whether the confiscation of the lands in controversy was complete or not, by the mere operation of those laws, without any further act to be done."

" This argument," said the court, " proves nothing more than that the whole difficulty in this case depends on that part of it which involves the construction of certain State laws, and that the operation and effect of the treaty, which constitutes the residue of the case, is obvious so soon as that construction is settled."

The court then asserting its appellate jurisdiction, which had been denied, proceeded to a reëxamination of the State laws, and affirmed the interpretation of them given by the State court to which the writ of error had issued.

In an elaborate opinion of this court, delivered by Justice Story, upon the point now in controversy, in Martin v. Hunter's Lessee (3 Cond. R. 571, 572 ; 1 Wheat. 304), he confirms the principle decided, and approves the case above cited from 6 Cranch.

In page 571 of the Cond. Rep., Justice Story says : " The objection urged at the bar is, that this court cannot inquire into the title, but simply into the correctness of the construction put upon the treaty by the Court of Appeals; and that their judgment is not reëxaminable here, unless it appear on the face of the record that some construction was put upon the treaty. If, therefore, that court might have decided upon the invalidity of the title (and *non constat* that they did not) independent of the treaty, there is an end of the appellate jurisdiction of this court," &c.

" If this be the true construction of the section," he continues, " it will be wholly inadequate for the purposes which it professes to have in view, and may be evaded at pleasure."

After rejecting the construction of the section contended for, he asks : " What is the case for which the body of the section provides a remedy by writ of error ? The answer must be in the words of the section. A suit where is drawn in question the construction of a treaty, and the decision is against the title set up by the party. It is, therefore, the decision with reference to the treaty, and not the mere abstract, construction of the treaty itself, upon which the statute pretends to found its appellate jurisdiction. How, indeed, can it be possible to decide whether a title be within the protection of a treaty, until it is ascertained what that title is, and whether it have a legal validity ? From the very necessity of the case, there must be a preliminary inquiry into the existence and structure of the title, before the court can construe the treaty in reference to that title. If the court below decide that the title was bad, and therefore not protected by the treaty, must not this court have a power to decide the title to be good, and therefore protected by the treaty ? "

The above cases are reviewed and confirmed in Crowell *v.* Randell, 10 Peters, 396.

If, therefore, there was nothing more in the record than that to which reference has been made in these remarks, I think the above cases fully sustain the appellate jurisdiction of the court in this case.

1st. Because the right of the plaintiff in error, claimed in his petition, as therein set forth, necessarily arises out of, or is protected by, the convention between Mexico and the United States.

2d. Because the decree of the Court of Appeals in denying this right, upon whatever grounds the denial proceeded, decided against the right itself.

But, in the second place, it is manifest by the record, and from the opinion and grounds of decision of a majority of the court, that the treaty itself was considered, and that, with reference to the claims of the Mexican Company, its validity was virtually impeached, and its effect and operation altogether denied.

The court say : " That the entire contract, upon which the claim of the appellee," now plaintiff in error, " is founded, is so fraught with illegality and turpitude, as to be utterly null and void, and conferring no rights or obligations upon any of the contracting parties which can be sustained or countenanced by any court of law or equity in this State, or of the United

States; that it has no legal or moral obligation to support it, and that therefore, under the insolvent laws of Maryland, such a claim does not pass to or vest in the trustee of an insolvent petitioner," &c., &c.

The words, "the entire contract," used by the court in its opinion, refer to the agreement made with General Mina by the different members of the Mexican Company.

This agreement will be found referred to in the plaintiff's printed statement, filed in this cause.

In the deposition of Lyde Goodwin, he states that the book showing the contract with Mina had been carried to Mexico, was before the commissioners at Washington, and "that this was the book on which the claim of the Mexican Company was founded and allowed by the commissioners."

The record in this cause will show that the same book was before the Court of Appeals, and constitutes the whole evidence going to show the character of Mina's entire contract with the members of the Mexican Company. It was upon this evidence that the company founded their claims against the Mexican government, and induced a recognition of their validity by the passage of an act of Congress by that government. It was upon the same evidence that the United States were prevailed upon to enter into negotiations with Mexico on behalf of the company, which finally terminated in a treaty in their favor, by the authority and under the provisions of which a board of commissioners was appointed, who on the same evidence pronounced an award in favor of the company, for the amount of their claim against the Mexican government.

Now the question is, whether the decree of the Court of Appeals against the claim of the plaintiff in error, on the ground of the turpitude of the contract out of which it arose, does not necessarily draw into question the validity, effect, and operation of the treaty and act of Congress under which the board of commissioners made their decision and award, directly contrary to that of the Court of Appeals.

The answer to this question will depend, first, on the power of the commissioners, and secondly, upon what they did decide.

By the first article of the treaty the commissioners had power "to examine and decide upon the said claims," that of the Mexican Company being undoubtedly one of them, " according to such evidence as shall be laid before them on the part of the United States and the Mexican republic respectively."

The fourth article declares that the Mexican government shall furnish such documents, &c., as may be in their possession, for the adjustment of said claims "according to the principles of justice, the law of nations, and the stipulations of

the treaty," &c. of amity and commerce between the United States and Mexico.

The fifth article imperatively requires the commissioners to " decide upon the justice of the said claims, and the amount of compensation, if any, due from the Mexican government in each case."

By the first section of the act of Congress passed 12th June, 1840, after directing in what manner the board of commissioners shall be constituted, it declares that the duty of the said board " shall be to receive and examine all claims which are provided for by the " said " convention," &c., &c., " and which may be presented to said commissioners under the same, and to decide thereon according to the provisions of the said convention, and the principles of justice, equity, and the law of nations."

It is perfectly clear, from the above extracts from the treaty and act of Congress, that the commissioners had ample power and authority, —

1st. To decide as to what claims came within the provisions of the convention;

2d. To decide upon the existence of such claims on the evidence produced before them, and their conformity to the principles of equity, justice, and the law of nations; and

3d. To ascertain and fix the amount due on said claims from the Mexican government.

In the exercise of the powers thus conferred, and in fulfilment of the duties imposed upon them, the board of commissioners assembled at Washington, and, with reference to the claims of the Mexican Company, they received the evidence of their contract with General Mina, out of which the claim arose, and ascertained its amount, for which they gave an award in favor of the company against the government of Mexico.

This award refers to the claim of the Mexican Company, and states that it was for arms, vessels, munitions of war, goods, and money furnished to General Mina, for the service of Mexico, in the years 1816 and 1817.

Now the position which I assume is, that the award, made as it was in pursuance of the stipulations of the treaty and its requirements, and those of the act of Congress, and consequently upon the principles of justice, equity, and the law of nations, is perfectly conclusive in all courts of justice as to the innocency of the contract with Mina in 1816, and the validity and amount of the claim growing out of it,.

In the case of Comegys *v.* Vasse, 1 Peters, 212, the court use language in regard to the treaty then under discussion which is strictly applicable to the present case: —

" The object of the treaty was to invest the commissioners with full power and authority to receive, examine, and decide upon the amount and validity of the asserted claims against Spain, &c.; their decision within the scope of this authority is conclusive and final. If they pronounce the claim valid or invalid, if they ascertain the amount, their award in the premises is not reëxaminable. The parties must abide by it as the decree of a competent tribunal of exclusive jurisdiction."

If such be the effect of an award under a treaty, does not the decision of the Court of Appeals in this cause, pronouncing the contract of the company with Mina so infected with turpitude and corruption as that no legal or moral obligation could arise out of it, draw into question, and necessarily decide upon, the effect and operation of the convention, act of Congress, and award made in pursuance thereof, in a case where the plaintiff in error had claimed the funds in dispute in his petition, on the foundation of such convention, act of Congress, and award?

I am aware that it has been suggested that the Court of Appeals decided against the claim of the plaintiff in error, upon the construction of the insolvent laws of Maryland. But upon an examination of the opinion, it is perfectly obvious that they did not do so; on the contrary, it is strongly, if not necessarily, implied, that, if Goodwin's claim had been unaffected by turpitude, it would have passed to and become vested in his trustee, upon Goodwin's insolvency.

The Court of Appeals say that such a claim, that is, a claim originating in turpitude, does not pass under the insolvent laws of Maryland. The last proposition is not an independent one, but is the mere consequence of the first. The Mexican Company's contract with Mina was corrupt, and for that reason "bears no analogy to the class of cases, decided in Maryland and elsewhere, of claims not recoverable in a court of justice, which nevertheless have been held to vest in the trustees of an insolvent or the assignees of a bankrupt." Upon such an impure contract, devoid of any legal or moral obligation, Lyde Goodwin, previous to his application for the benefit of the insolvent laws, had in 1816 no claim whose validity the law would recognize in the shares of the Mexican Company, and as he had no legal right, none could pass to or become vested in the plaintiff in error, as his trustee. Thus was the plaintiff defeated in his suit, upon the very point where he might most surely have trusted to the protection of the treaty and the award under it.

The convention was not made to sanction corrupt and illegal agreements; on the contrary, no contracts, by its express terms, could fall within its provisions, but such as were in con-

formity with "justice, equity, and the law of nations." Upon these principles the commissioners were commanded to decide upon all the claims presented to them. When, then, they received and examined evidence in regard to the contract with Mina, they determined necessarily, in regard to that contract, that it was in its origin innocent and valid, otherwise they could not have allowed, as they did, the claims growing out of it. The decision, therefore, of the Court of Appeals, that their contract was corrupt, that no claim could have arisen out of it, and that the plaintiff in error could not recover, is in direct opposition to the treaty, act of Congress, and award, and in defiance of that protection which they afford to the right of the plaintiff in error, as set up in his petition.

I do not mean to say whether the decision of the court below is right or wrong, but merely that it draws in question necessarily the effect, operation, and validity of the convention with Mexico, and of the award of the commissioners, and therefore falls within the appellate jurisdiction of this court.

The following extract from the brief of the counsel for the defendants in error will show the manner in which they stated the point of jurisdiction.

The power of Brown, as Goodwin's provisional trustee, to assign Goodwin's interest to Oliver, the efficacy of Goodwin's own assignment to Oliver, the construction of the trusts of the deed of the 8th of May, 1841, from Oliver's Executors et al. to Glenn and Perrine, though part of the merits in the State court, are supposed to be no proper subjects of discussion here.

1st. The petitions of the plaintiff in error do not specially set up or claim any right or title under the convention with Mexico, or the act of Congress, or the award made in pursuance of them, nor does the court below decide against any such right or title. The petitions deny the title of Oliver's executors as assignees, and rest their demands on the official character of the plaintiff in error, as giving him title under the insolvent laws of Maryland, and on the trusts of the deed of the 8th of May, 1841, as constituting them trustees for him, being so entitled, and the decision of the State court turns altogether on its construction of those insolvent laws, which confer, in its judgment, no title on the plaintiff in error. Udell v. Davidson, 7 How. 771; Smith v. Hunter, 7 How. 743; Maney v. Porter, 4 How. 55; McDonogh v. Millaudon, 3 How. 705; Downes v. Scott, 4 How. 502; Kennedy v. Hunt, 7 How. 593; Fulton v. McAffee, 16 Pet. 149; Coons v. Gallagher, 15 Pet. 18; McKenney v. Carroll, 12 Pet. 66; Crowell v. Randell, 10 Pet. 392; Montgomery v. Hernandez, 12 Wheat. 129; Williams

v. Norris, 12 Wheat. 117 ; Hickie v. Starke, 1 Pet. 98 ; Mathews v. Zane, 7 Wheat. 206 ; Owings v. Norwood, 5 Cranch, 344 ; Smith v. The State of Maryland, 6 Cranch, 286 ; Plater v. Scott, 6 Gill & Johns. 116 ; Hall v. Gill, 10 Gill & Johns. 325 ; 1 Stat. at Large, 384.

2d. The decision of the State court, that Goodwin's claim did not pass to his permanent trustee on account of its illegality and turpitude, does not conflict with the award, or the treaty or act of Congress under which the award was passed, because the commissioners were empowered to decide nothing but the liability of Mexico for the claims set up against that republic, which were admitted by Mexico prior to the treaty, but long after Goodwin's application ; and because the said convention or treaty of 1839, and the proceedings under it, cannot affect the question, whether the insolvent laws of Maryland did or did not operate in 1817 to transfer the claim to the trustee of Goodwin, the force and effect of these laws at the time when Goodwin applied being the question before the court below. Comegys v. Vasse, 1 Pet. 212 ; Sheppard v. Taylor, 5 Pet. 713 ; Frevall v. Bache, 14 Pet. 97 ; Maryland Acts of 1805, ch. 110, and 1816, ch. 221 ; Hall v. Gill, 10 Gill & Johns. 325.

3d. By the well-settled law of Maryland, as applicable to Goodwin's and all other applications for the benefit of the insolvent laws at that period (1817), the plaintiff in error, as trustee of Goodwin under his application, took title to no property, rights, or claims of Goodwin the insolvent, but such as he had at the date of his application. At that period, Goodwin had no possible right or claim against the government of Mexico, which did not come into existence for several years afterwards, nor against the then existing government of Spain in Mexico, which Mina's expedition was designed to overthrow ; and the only alleged or possible claim he, Goodwin, then had, was against Mina, under Mina's contract with the Mexican Company ; and this contract with Mina, as the State court has declared by its decision, was illegal, and created no right or claim in Goodwin which could or did pass to his trustee, under his said application in 1817. The decision of the State court, therefore, involved but two questions, the first of which was, whether said contract with Mina vested any rights in Goodwin, at the date of his application in 1817, which passed to his trustee ; and the second, whether the treaty and award, allowing as against Mexico the claim of the Mexican Company, under its said contract with Mina, had any such operation or retrospect, as to that contract, as to validate it in Maryland as between the original parties, and to validate it ab initio, so as to vest in the trustee by retroactive rights and claims under that

contract, which had no legal existence at the period of Good-win's application. The first question, the defendants in error will maintain, is conclusively established by the decision of the State court, and is not open to inquiry here, as it involves nothing but the decision of the Maryland court upon a Maryland contract, as to the rights created by it, and the transfer of those rights in 1817 to the trustee of the insolvent. The second, and, as the defendants will maintain, the only possible question open here, will be as to the operation of the treaty and award. And as the State court has not expressed any specific opinion as to the treaty, or any right or title set up or claimed under it, the jurisdiction can only be maintained, if at all, by establishing that such a right or title was involved in the decision of the question, and that the treaty did so retroact as to validate said contract *ab initio*, and vest in the trustee of 1817 the rights given by that contract, which rights so vested in the trustee the decision of the State court denied him. And the defendants in error will maintain, that even if there be any such right, title, or privilege specially set up or claimed under the treaty as to give jurisdiction, which they deny, yet the treaty could not have, and was not intended to have, any such operation or retrospect. They will insist that the treaty and award under it had, and could have, no other effect, than to establish the liability of Mexico to pay that claim under the treaty, and settled nothing but the validity of that claim against Mexico; and that by the award made under it to Glenn and Perrine, the trustees of the defendants, the defendants have the only right or title set up, claimed, or obtained under the treaty, which the plaintiff in error can controvert only by showing that they were entitled to the claim thus allowed to the defendants, and that the treaty and award settled no rights as between the claimants, but merely the obligation of Mexico to pay the claim. They will further insist, that the question, whether the original contract between Mina and the Mexican Company gave Goodwin any rights which passed to his trustee in 1817, was a question of Maryland law upon a Maryland contract, upon which Mexico's subsequent recognition or agreement to pay that claim, as due by herself, could have no influence; that Mexico's subsequent agreement to pay the claim herself had no bearing upon the question as to what were the rights of Goodwin in Maryland, under the original contract between Mina and the Mexican Company; and that the express waiver by Mexico, or even by the Spanish government which she overthrew, or the objection of illegality as far as she was concerned, could not affect the question of the validity of the original contract in Maryland, and under the laws of Maryland, and

above all, could not retrospect so as to repeal the laws of Maryland by validating that original contract *ab initio*, and passing the rights under it to the trustee of 1817. And as the result of the whole, therefore, the defendants in error will maintain, that the decision of the State court has conclusively established the original invalidity of the contract, and that the trustee took no rights under it; and that the treaty, if there be any question raised under it, gave the plaintiff in error no right, title, or privilege which can affect that decision, or was denied by the State court. Milne *v.* Haber, 3 McLean, 212; and authorities under the first and second points.

Mr. Justice GRIER delivered the opinion of the court.

If this court can take jurisdiction of this case under the twenty-fifth section of the Judiciary Act, it must be under either the first or third clause, as the second is admitted to be wholly inapplicable to it.

1. The first is, " where is drawn in question the validity of a treaty or statute of, or an authority exercised under the United States, and the decision is against their validity."

2. The third is, " where is drawn in question the construction of any clause of the Constitution, or of a treaty or statute of, or commission held under the United States, and the decision is against the title, right, privilege, or exemption specially set up or claimed by either party under such clause," &c.

1. We have sought in vain through the record of this case to find any question raised directly by the pleadings, or " by clear and necessary intendment therefrom," touching the validity of any treaty, statute, or authority exercised under the United States.

Both parties claim certain moneys in court as assignees of Lyde Goodwin, who was a member of the " Baltimore Mexican Company," and entitled to a certain proportion of the money awarded to said company as a just claim on the Mexican government. The validity of the award, or the treaty under which it was made, is not called in question by either party, as both claim under them. In order to ascertain the effect of certain previous assignments made by Lyde Goodwin, the history of the origin of his claim necessarily makes a part of the case.

The treaty and award are introduced as a part of this history, as facts not disputed by either party. The money being in court, both the treaty and the award were *functi officio*, and no decision of the rights of the claimants *inter se* can, in the nature of the case, involve the validity of either.

The decision of the Court of Appeals, that the original contract with Mina in 1816 did not create such a debt as would

46*

pass by the insolvent laws of Maryland, neither directly nor by implication questions the validity of any treaty, statute, or authority under the United States.

That the Baltimore Mexican Company set on foot and prepared the means of a military expedition against the territories and dominions of the king of Spain, a foreign prince with whom the United States were at peace, is a fact in the history of the case not disputed, and which if wrongly found by the court would not give us jurisdiction of the case. That such conduct of the company in making their contract with General Mina was a high misdemeanor, punishable with fine and imprisonment by the fifth section of the act of the 5th of June, 1794, chap. 51, cannot be disputed by any one who will read the statute; and the conclusion drawn therefrom by the court below, that the contract of the company with Mina in 1816, being founded on an illegal transaction, was void by the law of Maryland, where it was made, and passed no equity, right, or title whatsoever to an insolvent assignee in 1817, involved no question of "the validity of any treaty or statute of, or an authority exercised under the United States."

The validity or binding effect of the original contract with Mina is neither directly nor indirectly affirmed, either in the convention with Mexico or in the award of the commissioners under it.

The fact that the "Baltimore Mexican Company" exposed not only their property to capture by the Spanish vessels of war, but their own persons to fine and imprisonment by the authorities of the United States, only enhanced the justice and equity of their claims against the new government of Mexico.

The original contract with General Mina was a Maryland contract, and its validity and construction are questions of Maryland law, which this court is not authorized to decide in the present action.

2. We are equally at a loss to discover in this record where or how "the *construction* of any clause of the Constitution, or of a treaty or statute of, or commission held under the United States," is drawn in question in this case.

As we have already said, both parties claim money in court; and, in order to test the value of their respective assignments from Lyde Goodwin, introduce the history of the claim from its origin.

The treaty and award are facts in that history. They were before the court but as facts, and not for construction. If A. hold land under a patent from the United States or a Spanish grant ratified by treaty, and his heirs, devisees, or assignees dispute as to which has the best title under him; this does not

make a case for the jurisdiction of this court under the twenty-fifth section of the Judiciary Act. If neither the validity nor construction of the patent or title under the treaty is contested, if both parties claim under it, and the contest arises from some question without or *dehors* the patent or the treaty, it is plainly no case for our interference under this section.

That the title originated in such a patent or treaty is a fact in the history of the case incidental to it, but the essential controversy between the parties is without and beyond it. So in this case, both claim the money in court. It is a fact that the money has been paid by the republic of Mexico, on a claim which has been pronounced just and equitable by commissioners under the convention of 1839. It is a fact, also, that the origin of this claim was for arms and ammunition furnished for an expedition under General Mina, for the purpose of insurrection against the Spanish government. It is a fact, that the Baltimore Mexican Company, or the individuals composing it, exposed themselves to punishment under the neutrality act. It is a fact, also, that afterwards, when Mexico had succeeded in establishing her independence; when her rebellion had become a successful revolution; that she very justly and honorably made herself debtor to those who perilled their property and persons in her service at the commencement of her struggle. It is a fact that, though this claim was acknowledged as a just debt by Mexico as early as 1825, payment was never obtained till after the award of the commissioners under the convention with Mexico in 1839, "for the adjustment of claims of citizens of the United States on the Mexican republic." It is a fact, that this claim thus recognized by the Mexican Congress was pronounced a just debt in favor of citizens of the United States against the republic of Mexico.

But whether this debt of the Mexican government, first acknowledged and made tangible as such in 1825, did previously exist as an equity, a right, or a chose in action capable of passing by assignment under the insolvent laws of Maryland in 1817, is a question not settled in the treaty or award, nor involving any question as to the construction of either, but arising wholly from without, and entirely independent of either the one or the other. The treaty was, that "all claims of citizens of the United States found to be just and equitable should be paid." The award was, that this claim of the "Baltimore Mexican Company," which had been acknowledged in 1825 as a valid claim by Mexico, was a just debt, not a false or feigned one, and ought to be paid. The money is awarded to be paid to Glenn and Perrine "in trust for whom it may concern." The award does not undertake to settle the equities or rights of

the different persons claiming to be legal or equitable assignees or transferees of the interests of the several members of the company. That is left to the tribunals of the State where the members of the company resided and the assignments were made. In deciding this question, the courts of Maryland have put no construction on the treaty or award, asserted by one party to be the true one and denied by the other. It was before them as a fact only, and not for the purpose of construction. Whether this money paid into court, under the award and first acknowledged by Mexico as a debt in 1825, existed as a debt transferable by the Maryland insolvent laws in 1817, or whether it, for the first time, assumed the nature of a chose in action transferable by assignment after 1825, when acknowledged of record by Mexico, and passed by the assignment of Lyde Goodwin to Robert Oliver, was a question wholly *dehors* the treaty and award, and involving the construction of the laws of Maryland only, and not of any treaty or statute or commission under the United States.

It is a conclusive test of the question of jurisdiction of this court in the present case, that, if we assume jurisdiction, and proceed to consider the merits of the case, we find it to involve no question either of validity or construction of treaties or statutes of the United States.

But the only questions in the case will be found to be, what was the effect of the appointment of George M. Gill in 1837 as permanent trustee, under the insolvent laws of Maryland of 1805 ? Was the void and illegal contract with Mina, made in 1816, such a chose in action as would pass by such insolvent law in 1817 ? Or did it first become an assignable claim after it was acknowledged by Mexico in 1825, and, as a new acquisition of Lyde Goodwin after his insolvency, pass by his assignment to Oliver. A resolution of these questions, by or through any thing to be found on the face of the treaty or award, or any necessary intendment or even possible inference therefrom, is palpably impossible.

The whole case evidently turns on the construction of the laws of Maryland, and on facts connected with the previous history of the claim, which are not disputed, and which are incidental to the treaty and award, but which raise no question either as to their validity or construction.

This case is therefore dismissed for want of jurisdiction.

Mr. Chief Justice TANEY, Mr. Justice McLEAN, Mr. Justice WAYNE, and Mr. Justice WOODBURY dissented.

Chief Justice TANEY stated that, in his opinion, this court

had jurisdiction of the question upon which the case was decided in the Court of Appeals of Maryland, and that their decision was erroneous, and ought to be reversed.

Mr. Justice McLEAN concurred in opinion with the Chief Justice.

Mr. Justice WOODBURY.

I object to the form of the judgment to be entered in this case, rather than to the results of it to the parties. By dismissing the writ of error for want of jurisdiction, as is done here, the judgment in the State court is left in full force; whereas, in my view, this court has jurisdiction, and should affirm the judgment in the State court, thus leaving it, as the other course does, in full force, but on different grounds. The consequence to the parties, by pursuing either course, differs so little, that it does not seem necessary to go into any elaborate exposition of the reasons for this dissent, and I shall therefore content myself with stating only the general grounds for it.

All that seems indispensable to give jurisdiction to us in this class of cases is, that the plaintiff in error should have set up, in support of his claim in the State court, some right or title under a treaty or doings by authority from Congress, and that it should be overruled by the State court. See the twenty-fifth section of the act of 1789 (1 Stat. at Large, 85), and various decisions under it, including Owings *v.* Northwood's Lessee, 5 Cranch, 348, and Smith *v.* Maryland, 6 Cranch, 304; 2 Howard, 372. Here the appellant set up in his bill a claim to money under a treaty with Mexico, and an award under it by commissioners appointed by an act of Congress, and the State court, in his opinion, overruled his claim. This, in my view, gives jurisdiction to us, whether the State court decided right or wrong. See Armstrong *v.* Athens County, 16 Peters, 285; Miller *v.* Nichols, 4 Wheat. 311. The very object of the writ of error is to ascertain whether they did decide right or wrong, and the jurisdiction to make this revision of their opinion arises not from its error, but its subject-matter; the latter being a claim set up under some United States authority. Neilson *v.* Lagow, 7 Howard, 775.

The next and only remaining inquiry for me, supposing that we have jurisdiction, is, whether the State court formed a right conclusion in overruling the claim set up by the appellant. I think they did. So far as it rested on authority under the United States, it is by no means clear that they overruled it improperly. The claim, so far as regards the enforcement of the treaty with Mexico, does not seem to have been overruled

in terms by the State court. That court did not decide that the treaty was corrupt or illegal, or in any way a nullity, when they held that the original contract violated the laws of neutrality. So far, too, as regards the award made by the commissioners, that the Baltimore Mexican Company and their legal representatives had a just claim under the treaty for the amount awarded, it was not overruled at all.

It is not manifest, then, that any thing really in the treaty or in the award, set up by Gill, the plaintiff, was actually decided against, but only something he claimed to be there; — that when the appellants claimed that he, rather than others, was legally entitled to one ninth of the sum awarded to the Baltimore Mexican Company, the State court seems to have overruled that. But in doing this, they must still have held the treaty itself to be valid, and the award of the commissioners under it to be valid, or they could not have decreed this share of the fund to Oliver's executors, as they appear to have done expressly by the record.

All must concede, that the State court speaks in its language against the Mina "contract" alone as illegal, and in terms do not impugn either the treaty or the award; and it is merely a matter of inference or argument that either of these was assailed, or any right properly claimed under them overruled. But it is true the court held that Oliver's executors, rather than the appellant, were entitled to the fund furnished by Mexico, and long subsequent to Mina's contract; but in coming to that conclusion, they seem to have been governed by their views as to their own laws and the principles of general jurisprudence. The treaty or award contained nothing as to the point whether Gill or Oliver's executors had the better right to this share, but only that the Mexican Company and their legal representatives should receive the fund. This last the court did not question.

But who was the legal representative of Lyde Goodwin's share? Who, by insolvencies, sales, or otherwise, had become entitled to it?

That was the question before the court, and the one they settled; and in deciding that, they overruled the claim of Gill to be so, by virtue of any authority in the treaty or award; and in saying that the fund should go to Oliver's executors, as best entitled, rather than Gill, they did it under their own State laws.

It is a general rule for the State tribunals, and not the commissioners, to settle any conflict between different claimants; and the usage, when disputes exist, is not for commissioners to go further than act on the validity of the claim, and decide

besides the superior rights of one of the claimants. Frevall *v*. Bache et al., 14 Peters, 95; Comegys *v*. Vasse, 1 Peters, 212; Sheppard *v*. Taylor et al., 5 Peters, 710.

It is true, that the opinion given in the State court in support of its judgment is not entirely free from some grounds for misconception, yet the judgment itself appears right, and, if erroneous, resting as it does wholly on the State laws, it is not competent for us, under this writ of error, to reverse it. We can reverse it only when wrong, and wrong, too, for deciding improperly against some claim under a United States law or treaty.

This, I think, it has not done. In short, the whole real truth appears to be, that the State court considered the Mina contract in 1817 as a violation of the neutrality act of 1794; and therefore, when Lyde Goodwin failed in the same year, and went into insolvency, that his share in the contract, being illegal and void, could not then pass to his creditors, or his trustee in their behalf. But when the Mexican government, about 1825, adopted the contract, and acknowledged its liability to pay those entitled, the court seems to have thought that their obligation was virtually a new one. It occurred after the insolvency, and hence seems supposed not to have passed to the creditors, any more than did new property subsequently acquired. (See Insolvent Act of 1805, ch. 110, § 2.) Consequently, the commissioners held that the creditors and their trustee were not entitled to its benefits. Goodwin could and did legally assign to Oliver his new rights and new guarantees, for his share from Mexico. These last, though growing out of the original Mina purchase, were not a violation of the act of 1794, — were honorable, though not compellable, and were not deemed illegal either by Mexico or the government of the United States, or the commissioners, or the State court.

Again, under the State laws doubts seemed to arise, (in deciding on which was the proper claimant,) whether the original trustee was not duly appointed in 1817, and could not legally assign this claim, if it passed to him then or afterwards, as he attempted to pass it to Oliver, rather than considering it as belonging to, or vesting in, Gill, the appellant, who was not appointed trustee till 1825, and then in a manner somewhat questionable. (4 Gill & Johns. 392.) That, however, was likewise a point arising exclusively under the State laws, and which we are not authorized to decide in this writ of error.

It is for reasons like these, that, in my opinion, the judgment in the State court, so far as it related to any claim set up and supposed to be overruled under any authority derived from the United States, is within our jurisdiction; but that the State

court did not improperly overrule any such claim so set up, and hence that the judgment in the State court ought to be affirmed.

## Order.

This cause came on to be heard on the transcript of the record from the Court of Appeals for the Western Shore of Maryland, and was argued by counsel. On consideration whereof, it is now here ordered, adjudged, and decreed by this court, that this cause be, and the same is hereby, dismissed, for the want of jurisdiction.